We have tried to cover a short trial in lengthy briefs, and I think we've made most of our The first is this, your honors. When we were here before you last time, the issue was whether West Publishing Company could ignore the contract rights that CHODOS had under his contract with Bancroft Whitney in order to advance their own corporate economic agenda. And the court held that it could not do so, and that it had no right to terminate the publishing contract merely because it felt like doing so or thought it was in its best interest to do so, and set the matter back for trial on the question of damages. At the new trial, West was up to its old tricks. I'm sure your honors have watched those cartoons where they push a pirate off the front of the boat, make him walk the plank, and then he swims around the back and climbs up the ladder and smuggles in his ideas again. At the new trial, what they said was, OK, it's now settled that we breached the contract. It's now settled that CHODOS is entitled to recover in quantum merit. It's now settled that he's entitled to restitution on what we insist in our jury trial argument are equitable principles. But the measure of damages should be not what it cost him, but what we would have been willing to pay. When you translate West's open market theory, and by the way, it is West's open market theory, even though the district court adopted it and emphatically told the jury it was the law, it's really West's theory. The open market theory means what we, West, would have been willing to pay some other author to write a book like this. Now, the test is not what they would have been willing to pay some other author to write some other book. The test, it seems to me, your honors, is what it cost CHODOS to write the book at their request. In MAGLICA, which is the most recent California case on the subject of quantum merit, it is clearly said that the value or the benefit to the defendant is irrelevant in measuring quantum merit. And that is true whether the benefit to the defendant is very great or very small, because the test is the cost to the plaintiff. Now, your honors, there is a case referred to in the briefs called SHADE, which is the millworker case. I think your honors may remember that in that case, the question of the value of the plaintiff's services was to be measured by what those services would bring in the open market. Now, every worker is worthy of his hire. Millwork is as dignified as legal authorship. But the fact is that millworkers, like people at the Union Hall, perform tasks which can readily be performed by others. And there is a market for the labor of millworkers, $10 an hour or $20 an hour, whatever it may be. There is no market, your honors, and West's own expert witness conceded that there is no market where practicing lawyers sell their services in writing books to legal book publishers at hourly rates. That's because lawyers earn $400 an hour. Publishers want to pay $25 an hour. No lawyer would agree to write a book, no practicing lawyer whose time can be sold for $400 an hour would ever agree to write a book for $25 an hour. And West would never agree to pay a lawyer $400 an hour to write a book because it's not economical. And so they resolved that problem in the open market by the kind of deal they actually made with Chodos. It wasn't their testimony that Chodos expected a return of $150,000? That is incorrect, your honors. Chodos was told that Bancroft Whitney expected to sell about $1 million worth of this book, out of which he would have made 15% royalties plus referrals. And if your honors will do the arithmetic, it's pretty simple. In order to sell $1 million worth of the book, they would have had to sell about 6 or 7,000 copies. The book sells for $175. If 7,000 copies of this book have been placed in law offices, law libraries, university law libraries, county law libraries around the state and around the country, I promise you that Chodos would have had referral business worth millions and millions of dollars. Trust me when I tell you that it is possible to make millions of dollars from handling cases which turn on the subtle issues of fiduciary duty. And Rayfield Chodos has done so, and I have done so. And the point is, if you have a publishing and marketing engine like West Publishing Company outselling your book, you are going to get some referrals. This is the only book in the world, the only systematic book on the law of fiduciary duties. Rayfield Chodos is an expert, and he deserves to have referrals. And Barbary testified, obviously, lawyers don't, practicing lawyers don't write books either by the hour or just for the royalties. They do so in the hope of enhancing their reputations and obtaining referral business. But the problem is, Your Honor, if I can now focus on your question, the issue is not what Chodos expected to get from the contract. They breached the contract. And so he cannot get what he expected to get from the contract because it's just too speculative. And so what this Court held last time is he is to receive not what he expected to get from the contract, which is contract damages, but the value of the time and effort he reasonably invested in writing the manuscript. His time and effort, Your Honors, is worth $400 an hour. He sells it for $400 an hour. He testified at the trial that he made, if you figure the 1,500 hours in a year, and you sell that time for $400, that's $600,000. Rayfield testified that he had made over $600,000 a year for many years before he started writing the book, and he made more than $600,000 a year after he stopped writing the book. But he didn't make it while he was writing the book because he spent that much time writing it. That's what it cost him. And what he might have gotten or what he expected to get from the contract is not important. It's not relevant. In fact, I offered to bring copies of the book, and I was notified that the Court denied my request. Ginsburg, similarly, what it cost him is also a contract measure of damages, isn't it? I'm sorry, Your Honor. I'm sorry. I don't speak a lot. What it cost him is also a measure of contract damages. And we're looking at restitution. No, Your Honor. What it cost him is the measure of damages in quantumerity. That's what Earhart v. Lowe holds. That's what Coleman Engineering, Justice Traynor's dissenting opinion in Coleman, which was adopted in Earhart, says, that the cost to the plaintiff is the measure of quantumerity. And that is because it sometimes happens that a person will make a contract, and it costs him more to perform it than he ends up getting from it or than he's agreed to take for it. If the other party honors the contract, he only pays what the contract price is. But if he breaches the contract, he has to reimburse and make restitution to the plaintiff in the amount equal to what it costs the plaintiff. Because, if I can turn to the equitable principles idea, I have a very bad cold, Your Honor, so you'll forgive me if I'm a little hoarse. In arguing incorrectly that quantumerity cases should be tried to the court, West emphasizes that quantumerity is a remedy which is predicated on equitable principles. That is true. The action is one at law, which is triable to a jury, but it is based on equitable principles. The only equitable outcome in a claim for restitution is that the plaintiff should be made whole. The plaintiff has invested all these hours on the promise of Bancroft, Whitney, and West that they would publish his book and that they would see to it that it was circulated throughout the legal community. Your Honors understand that West Publishing Company probably has 90 percent of the lawyers in the country as customers on their mailing list. And West Publishing Company can put this book into more law offices in an hour than most people could do in a year. And so Rayfield spent a great deal of time writing the book for them as they dictated, according to their requirements and according to their criteria, because he wanted the benefit of their publishing power and strength. At the very last minute, after he wrote the book exactly as they asked him to do, they changed their minds. Now they need to make him whole. Now, Your Honors, if I can just mention one other point. I just mentioned Trainor's dissent, which you say was adopted in Earhart. Didn't that stand for the proposition that you don't look at whether or not the defendant received any benefit? Not that you look to what it costs the plaintiff. Yes. What Earhart says and what Maglicka says is that you do not measure the plaintiff's recovery in Quantum Merowith by the benefit to the defendant. In Maglicka, you remember, the plaintiff was awarded $84 million because she designed the flashlight that made this company. The court said the benefit to the defendant is irrelevant. The question is, what does it take to make the plaintiff whole? Now, sometimes that's more than the benefit to the defendant. Sometimes that's less. You remember in Earhart versus Lowe, the situation was that the plaintiff had built some improvements on two adjoining parcels of property. One belonged to the defendant, and the other belonged to some third party. When he sued in Quantum Merowith, the defendant said, I didn't get any benefit from the part you built on the adjoining land. It's not my land. I don't get any use out of it. The court said, we hereby overrule the line of cases, Rotel versus Azura, I think was the name of one of them. There were two or three others. And they said, we now hold that it is irrelevant whether the defendant benefited or how much. The test is the cost to the plaintiff. So is your proposed measure of damages, the 1.4, strictly a billable hour type analysis, like what he could have charged a client for that time? Well, the fact is, that's what he sells his billable hours for. And that's those are the people to whom he sells his billable hours. In other words, a person only has so many hours. If you spend your hours writing a book for Bancroft Whitney, you don't get to spend them doing whatever else you might do. Now, Rayfield doesn't claim that he gets to collect from them for 24 hours a day. But what he does claim is, I spend at least 1,500 hours a year working on law matters that I bill to clients. I wasn't able to do that while I was writing the book. If I hadn't been writing the book, I could have sold them to clients and made $400 an hour. And why should West now be able to breach the contract and then end up paying Rayfield not only not what they promised him, but $25 an hour that they would pay to some guy who writes by the character, $60 for 2,500 characters, as though all books were fungible? Yes. At some point in the discussion about the instructions, didn't you agree that the open market concept could be in the instruction? Yes. It was West's instruction. Yeah, requested instruction that the judge. The court said that you agree to open market. Now, you're not going to appeal on the basis that open markets the wrong test. No. Here's what happened. West requested an open market instruction. The judge said she was going to give the open market instruction. I then cross-examined their only material witness, Irv Barbrey, for most of the day on what he meant by open market and was there an open market, and he admitted there wasn't an open market. We went through all of that. And then the judge came out with apparently she had handed it out earlier, and I hadn't seen it because I'd been busy cross-examining the witness. And it was something even more unfavorable. And I asked her to give the open market instruction she had previously said she was going to give rather than the new one. And I told her that I would not complain that she gave the open market instruction from earlier in the trial rather than the new one, and I am not complaining of that. Well, what does that does that mean? You're not complaining about the open market instruction? No. What are you? When you said you were not going to complain about it, you're. What does that mean that you're not going to complain that she gave that instruction? Well, I'm not going to complain that she gave that instruction instead of the new one that she had offered. Well, you're not going to say that the court of appeals that she had a one that was even worse. And we're not objecting to the fact that she didn't give one that was even worse? No. I did object to the one that was even worse. It was even worse. She didn't give it? No. Okay. Let me suggest something to you, Your Honors. Maybe I can answer your question this way. The instruction that she gave to the jury was in determining the reasonable value of Chodas's services, you can consider what his services might have brought in the open market. Now, that instruction standing alone I don't consider error, because Rayfield's services bring $400 an hour in the open market where he operates, which is the open market for lawyer services. What happened was we got into the argument and the supplemental argument, and West was saying the only market you can consider is an open market for author services. And I pointed out to the jury and to the judge, there is no open market for author services by practicing lawyers other than a market where they get royalties and a chance for referrals. That deal was taken off the table. I told the jury there is no open market where lawyers like Rayfield will sell their services for $25 an hour because they won't take that, and publishers won't pay $400 an hour, so there is no open market. But I said the judge gave you this instruction because West asked for it. And then the judge became irritated and told the jury, I didn't give it because West asked for it. I gave it because it's the law. Now, giving that instruction at that stage of the trial, in the middle of the deliberations, after the evidence and after the closing argument, effectively told the jury that they should ignore our arguments and assume that there was some kind of an open market of the kind that West hypothesized or West's witness hypothesized, but which had never been proven to exist. Well, if that were true, why didn't the jury come back with a verdict of $67,200? I'll tell you why I think they didn't. They didn't because they couldn't bear to do that. But on the other hand, the judge had given them this legal problem and sent them to sea in a rudderless boat. And they now found themselves in a position where after ten hours of deliberation and four questions to the court and the admonition that I've just described to you, they felt somehow they had to compromise between our theory and West's theory. And so what they did is they awarded a number in the middle that has no support in either West's theory or our theory. I mean, on the evidence that is before you, there are only two answers. Either Raphael is entitled to $67,200 as West claims on West's open market theory, or he's entitled to $1,440,000 because that's the value of the time and effort he invested in writing the manuscript to him. There is no basis for $300,000. It is strictly a compromise verdict. It's as though we had a case where there's a plane crash. The judge tells the jury, under the Warsaw Convention, the plaintiff gets $75,000. Under California law, he gets a million dollars. You may consider both of these. The jury comes in with $300,000. That does not comport with the facts or the law or this Court's instruction. The only thing, it seems to me, Your Honors are confronted with the legal issue that the district court refused to decide and instead gave to the jury, that the district court should have decided and that, Your Honors, you should decide. Raphael is entitled to be made whole, and the only thing that will do that is to award him his $400 an hour. Scalia. Thank you, counsel. Can I save a couple of minutes for rebuttal, Your Honor? Well, you could if you had anything to say, but we'll give you a couple of minutes even though you have nothing to say. Good morning, Your Honors. Randy Kaye, appearing for West Publishing. This appeal arises from a routine three-day civil jury trial on a single claim on a single issue. What we're here for, obviously, is to determine whether or not there was any reversible error. But instead, what we see in the plaintiff's papers and in the argument is a continuation of the closing argument. All of the issues they have raised were presented to the jury. They made their argument, and the verdict is what it is. The verdict is something between what the defendant asked the jury to award and what the plaintiff asked the jury to award. It's entirely within the realm of the jury to do that in a claim for quantum meruit. It's also noteworthy that Mr. Chodos' appeal is grounded in significant inaccuracies about the record, and let me state that right here. Mr. Chodos' brief states that his devotion of 3,600 hours was undisputed, and that's entirely incorrect, and I will address that. He states that West did not challenge his $400 rate as being applicable. That's not correct. He states that West did not identify a single alternative author who could have written that work, and that's not correct. The record shows otherwise. We have a general verdict of $300,000 here. It's very unsurprising. It's exactly double the $150,000 expectation damages going into the case. The record shows Mr. Chodos' testimony that his expectation of compensation from West going into this contract was $150,000. At trial, we heard evidence from both sides about what happened, and the jury came in at twice that amount. It's rational. Why are you cross-appealing then? The cross-appeal is solely conditional on if we are reversed and remanded. So we are not pursuing that if the $300,000 verdict is affirmed. What we have in the trial court is the proper application of law, presentation of evidence by both sides on the facts, and a verdict in conformity with the evidence. Let me discuss the law on open market. We were here last time, and the Ninth Circuit, in its opinion, stated that it did not express any opinion how restitution should be calculated in this case, nor do we intimate any suggestion as to the appropriate amount of such recovery. The law on the recovery in Quantum Merowith is stated in Maglicka, as well as in Arison, Shade, and Laver. Maglicka approved a jury instruction that stated that the plaintiff may be compensated by the reasonable value of what it would have cost the defendant to obtain the services plaintiff provided from another person. Arison says the appropriate inquiry is what would Arison have been paid if his services had been bargained for by the parties. The Maglicka instruction said it can be either one or two. You read one, right? I read the part of the instruction that was approved. The other part of the instruction was reversed in Maglicka. All right. Now, there's comment that a mill worker is fungible. But in Arison, we're talking about somebody in software sales, an individual effort in selling product. In Maglicka, a business operator, an inventor who came up with a pocket flashlight. And in Laver, we're talking about architects, also a profession. There's no reason to say that this case is any different and it requires deviation from the established law. The instruction given to the jury starts out with the exact verbiage from the opinion from this Court. Award him the value of the time and effort he reasonably invested in writing the manuscript. The district court then added a comma and a clause from Arison that was specifically designed to assist the plaintiff with his argument. It goes on to say, including the extent, character, and value of plaintiff's services. And the record is clear. The district court added that language and advised the plaintiff he's permitted to argue for $1.44 million under that clause. And there's no mistake in the record. He argued repeatedly for $1.44 million. Everyone knows that. The court then went on to add an additional sentence, that in assessing the reasonable value of plaintiff's time and effort, you may, and we had lots of discussion about may, may evaluate what he would have been paid if the parties had bargained for plaintiff's services in the open market. That's based on Maglica and Arison and other authority. But there is no authority in California whatsoever to compensate the plaintiff in a quantum error case for his opportunity cost. And the plaintiff says, well, that's inequitable. Well, we're here in this case under this claim because the plaintiff advanced the claim. In 1999, we were pursuing breach of express contract, and that changed when the plaintiff amended his complaint. The plaintiff went this direction to try to get his $1.44 million because it was evident he would never get it under contract damages. So he elected this route. The law is the law, though, and it permits consideration of the open market. On the issue of the jury's verdict being supported by the ---- Not because he wants the royalty that you're going to get because royalty won't be much, but he agrees to write a book because it will give him the benefit, Mr. Chodos says, that he will then become the expert in the field and will get a lot of business and assume there's a breach of that contract. Is there no theory under which you can recover more than what you would have received had the contract been honored? Well, I believe there's a couple concepts there. One is, theoretically, the plaintiff could have provided evidence at court, in the district court, that what persons in that position get paid includes a component of enhanced reputation leading to referrals. There was no such evidence from a lay witness or an expert. So if that were to fit within the framework of the open market concept of what persons in that position get paid, that could have been presented, but it wasn't. Well, would that fit within the open market concept of the fact that the author would make additional amounts as a result of becoming an expert and receiving referrals? Would that fit within the open market concept? It could if that is the manner in which persons in that position are compensated. They're not compensated by the publisher. They make money from third parties subsequently as a result of the publication. Under the MAGLICA jury instruction, no, that would not be recoverable from the defendant because the focus is what it would have cost the defendant to obtain the services plaintiff provided from another person. So my question was, is there any way to recover that? If you agree to write a book for a minimal amount because of the benefit you gain, and you do it, and then the contract's breached. Yes, under breach of contract. Is there any under breach of contract you could recover that? Under standard express breach of contract, which we don't have here, yes. Under Quantum Marowit and the law of Eris and Laver, MAGLICA, shade, no. So if this were a breach of contract suit, and if it were true, that lawyers write these books in order to, for the ancillary benefit of receiving referrals, that would be part of a claim for breach of contract damages? Yes, because you're looking then at compensatory damages and Hadley v. Baxendale and what flows from that, and the loss is an entirely different inquiry than California Quantum Marowit law. All right. I was just trying to ascertain where, how that could be compensated for. And you say it could be compensated for in a breach of contract case. Yes, with the right evidence, the right witnesses. No, no, assuming that you had evidence that that's why lawyers write these books and that, in fact, they do benefit from that. Correct. Then you'd say it would be a proper recovery in a breach of contract suit. Correct. Now, the plaintiff has presented a substantial evidence claim that I must address, and we've briefed that the plaintiff never complied with Federal Rule of Civil Procedure 50, and the plaintiff did not include in his excerpts the portion of the transcripts that support the verdict. Let me briefly outline those facts. One is many of his hours were for computer programming. The plaintiff presented his computer program in court but could not get it to work. The jury saw the plaintiff's skills and ability with his computer program. It questions whether he ought to receive a very high rate or a different rate. He admitted in his testimony that some of his time he's claiming was for while he was driving or practicing tai chi or exercising, and he conceded that there were many times when he was not working on his manuscript and there was a two-month period he never worked on his manuscript because his brain was, as he said, scrambled, and he was unable to stick with it. There was plenty of testimony questioning was this actually 3,600 hours or not. Our expert testified that with his 33 years of legal publishing experience, he believed that 1,500 hours is what should reasonably be required to write this manuscript, and he stated that based upon his personal experience in writing as well as in years of reviewing other writers' works and years of supervising large groups of lawyers and editors. He's a witness who manages 90 people in legal writing. The evidence on the $400-an-hour rate has been grossly inflated, included Mr. Trotis' own testimony that in that time period he charged some clients 300, he charged some clients 350, some at 360, and that half of his work was contingent, so it's not hourly at all. He admitted he had no established rate as an author. He had no prominence as an author. His two prior published works had no commercial success. He made $1,000 off one. West presented evidence how other authors who do this work are paid, and that included the per-unit basis, and there's nothing irrational about a per-unit basis. It looks at the quantity of legal work that is assumed of high quality, and it compensates the person for that work. You look at the pages of original text, and Mr. Barbary testified that the range for the work is $40 to $60 a unit, and he used the high figure, and he arrived at $67,200. The issue about the open market evidence, the jury awarded $300,000, so clearly they did not even follow West's evidence about the open market, so that could not lead to reversible error. West presented and requested that the jury follow the per-unit basis and award $67,200. The question on substantial evidence is, is the verdict monstrous? Well, it may be, but that's not what's here. Should the verdict have been $67,200 on this record, or should the verdict have been $150,000 on this record? Maybe. We're not here complaining about that, but it cannot be said on an appeal that it's monstrous and it should be higher. Next, regarding the district court's comments on the law. This is the point during the deliberations. It was nothing other than a statement of what the law is. It is within the province of the judge, and it is the obligation of the judge. She did not comment on the evidence. Judges are even allowed to comment on the evidence and point out evidence that may be material. It was nothing other than informing the jury that this was the law, and Mr. Chodos invited this comment. First, West was against supplemental closings. Mr. Chodos advocated it. He then went on to say in his supplemental closing that West concocted this theory, and the court gave it at West's request. That is what instigated the court to say this is the law, and that is why the jury was presented it. So it was entirely appropriate. With regard to the conditional appeal, may I present argument on that at this time also? Regarding the judge-jury issue, I think it comes down to this court's interpretation of this court's prior ruling when it sent this to trial. And looking at footnote 12 in that opinion, when it said this was a legal issue, is that an interpretation of legal versus factual for summary judgment or legal versus equity for restitution? We went to trial for the equitable remedy of restitution, and it was our position that back then under the law, under Federal law, which governs this jury-judge-judge question, that it should have been a judge trial. Solely in the event that there's a reversal on Chodos's appeal, we would request that if there was a reversal, that it be reversed with instruction for there to be a bench trial. But under no circumstances would we suggest that this court would even have the ability to increase the verdict when we have all of the evidence presented on both sides and the verdict came in within the range of the two parties. In conclusion, the Arison court was presented with a similar situation, and the salesperson making the claim there was expecting an 8 percent commission on a software license. And what happened is he was making an effort to sell to Oracle, the customer, and Oracle instead acquired the business instead of taking the license. So he said, well, then therefore I want 8 percent of the acquisition. And the court said it defies common sense to believe that a salesman would be compensated at the same commission rate for the sale of a software license as he would for the sale of a company. So there you have a salesperson doing sales, same job, and the court saying it defies common sense for the two different types of sales you would have the same pay rate. Similarly here, it defies common sense to say that a practicing lawyer should get a billable hour rate in the sphere of what we're talking about, which is an unestablished author trying to write as an author for the marketplace for authors. Thank you. Just three points. First of all, in my reply brief at page five and six, I quoted the testimony of Mr. Barbary on cross-examination where I said, by the way, do you imagine that Rayfield wrote this book merely for the sake of getting a possible $150,000 and his share of the royalties? He answered, I can't speak to the issue of what he personally, what was personally behind his decision to write the book. He had, and I said, he had a goal, an intellectual and philosophical and professional goal to write an important book, and he also had a goal of enhancing his professional reputation so that he could hope to receive referral business from other lawyers who thought he was an expert on the law of fiduciary duty. You heard that testimony. Answer, I did. And you understand, don't you, that the motivation of obtaining prominence and obtaining referrals is a major part of the motivation of all practicing lawyers who write books on a royalty basis. That's the idea. Answer, I think it is certainly a substantial part of it. I would agree. So there was no secret on that topic. The second point I want to urge, and perhaps I should have brought it up when Judge Wardlaw asked me the question a little earlier. Your Honors, I haven't cited them, but I have no doubt you will agree that I could readily find you 500 cases in California and in the Ninth Circuit where lawyers sue in Quantum Merriwick for the reasonable value of their services and receive and are awarded $300, $400, $500 an hour. It's routine. Those, of course, are cases where they are suing for the reasonable value of their time and effort as lawyers. What West is really saying here is we wanted a practicing lawyer who would have demanded and whom we would have had to pay $400 an hour to do this on an hourly basis. But we weren't willing to do that because it didn't make economic sense. So we made the royalty slash referral deal. Now, when we breach that deal, they say we want to recast this negotiation into one that would never have happened. And not pay him the reasonable value of his time that any lawyer would expect to get and any judge would award, but rather the reasonable value of what we would have been willing to pay. Well, you know, your opposing counsel says that's because you chose Quantum Merriwick rather than breach of contract. Do you agree with him that if you had pursued breach of contract, you would have been able to get those damages you're talking about from reputation and referral? He should have been, except for the legal limitation on contract damages that prohibits an award of speculative damages. Because they breached the contract and didn't publish it, he would never have been able to prove how many copies they would have sold or how many referrals he would have gotten. That's the problem. It's the nature of this contract. He wanted the chance. It's just like suing you for a million dollars on the lottery ticket that you ripped up before they announced the winner. I can't prove that I would have won. I don't know what I would have won if I had actually gotten the lottery ticket and remembered the number. So they have made it impossible for Rayfield to get or to measure his contract damages. Therefore, it is irrelevant what he would have made from the book. What is only relevant is the reasonable value of the time and effort he reasonably invested in writing this manuscript. The jury instruction consisted of two sentences. Do you your objection is not to the first sentence? If it were only the first sentence, would it have been acceptable? If it were only the first sentence, it would be acceptable, except, Your Honors, now that we've exposed this issue, I'll return and I'll close with this. The proper measure of damages, the method of measuring damages is a legal question, which this Court must decide and on which the district court was obligated to instruct the jury. The district court was not entitled to leave it to the jury to decide whether quantum merriment meant the value to Rayfield or the value to West. What the parties would have bargained for means what West would have paid for it, which means the value to West. That legal question, Your Honors, needs to be determined, and the jury needed to be told. I will tell you, I heard Mr. Kaye's argument. If the judge had told the jury only, you should only consider the value to the plaintiff and the amount of hours and so on, and given the first part of the instruction. And Rayfield had put on his evidence and they put on about, you know, he wasn't thinking while he was doing Tai Chi and he wasn't thinking while he was driving the car, drinking coffee. And the jury had awarded $300,000 on that instruction. I wouldn't be here. But they didn't award $300,000 because they discounted his 3,600 hours. They awarded $300,000 because they had 67,200 and a million for, and no guidance as to what to do about it. I want to ask you one final question. Did you propose an instruction that's in the excerpt of record? Yes, I'm sure it is. I don't have the page right now, but I'm positive my requested instructions are in the excerpt of record, Your Honor, my excerpt. What did you request? I requested an instruction that said the value that included the components in the first sentence and said it is the value to the plaintiff that's important. The value to the defendant is irrelevant. Where's the benefit? So, all right. We can find that in the excerpt. Thank you. All right. Thank you, Mr. Chairman. Thank you, Your Honor. Thank you. Thank you both, counsel. The case discharged will be submitted. The Court will stand in recess for the day. All rise. This court for the second sentence adjourned.
judges: Browning, Reinhardt, Wardlaw